UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH CELLULAR TELEPHONE NUMBER (207) 631-3939 THAT IS STORED AT PREMISES CONROLLED BY VERIZON WIRELESS | No. 1:20-mj-00092-JCN |

AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT

I, Bryan Klutzaritz, being first duly sworn, hereby depose and state as follows:

INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a search warrant for information associated with certain accounts that are stored at premises owned, maintained, controlled, or operated by Verizon Wireless, a wireless provider headquartered at 180 Washington Valley Road, Bedminster, New Jersey 07921. The information to be searched is described in the following paragraphs and in Attachment A.

2. I am conducting an investigation into the drug trafficking activities of Daviston Jackson, FNU LNU, a/k/a "Chinx," Danielle McBreairty and others, who I believe have violated Title 21, United States Code, Sections 841(a)(1), 843, 846 and 856.

3. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Verizon Wireless to disclose to the government records and other information in its possession pertaining to the subscribers or customers associated with the accounts, including the contents of communications over telephone number (207) 631-3939 (hereinafter "Target Telephone"). As discussed below, there is probable cause to believe that the Target Telephone is being used by Daviston Jackson and others in connection with the drug trafficking activity that I am investigating.

4. I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C). I have been a Special Agent with the Drug Enforcement Administration ("DEA") since 2003 and I am presently assigned to the Bangor, Maine, office. I have received extensive training pertaining to narcotic investigations and the investigation of various crimes which arise from drug trafficking activities.

5. During my employment with DEA, I have participated in numerous investigations relating to the distribution of controlled substances, including methamphetamine, cocaine, heroin, diverted pharmaceuticals and other substances in violation of the federal anti-drug laws, including Title 21, United States Code, Sections 841 and 846. I have received training in the field of narcotics enforcement and investigations. I am familiar with the habits, methods, routines, practices and procedures commonly employed by persons engaged in the trafficking of illegal drugs.

6. The facts in this affidavit come from my personal observations, my training and experience, phone analysis, and information obtained from other agents and witnesses.

7. This Court has jurisdiction to issue the requested warrant because it is "a court with jurisdiction over the offense under investigation." 18 U.S.C. § 2703(a).

## LEGAL AUTHORITY

8. The legal authority for this application is derived from 18 U.S.C. §§ 2701-11, which is commonly known as the "Stored Communications Act" or "SCA." Section 2703(a) provides in relevant part that:

> A governmental entity may require the disclosure by a provider of electronic communication service of the contents of a wire or electronic communication, that is in electronic storage in an electronic communications system for one hundred and eighty days or less, only pursuant to a warrant issued using the

2

procedures described in the Federal Rules of Criminal Procedure by a court
with jurisdiction over the offense under investigation . . . .

18 U.S.C. § 2703(a).

9.      Pursuant to 18 U.S.C. § 2703(b)(1), the government is permitted to apply for the equivalent of a search warrant without required notice to the subscriber. See 18 U.S.C. § 2703(b)(1)(A).

## FACTS SUPPORTING PROBABLE CAUSE

### Background

10.     On December 12, 2019, your affiant participated in a proffer interview with a Cooperating Defendant (CD).[1] In September of 2019, members of the Maine State Police stopped a vehicle on Interstate 95 being driven by CD. As a result of the traffic stop, officers seized approximately five (5) pounds of methamphetamine from the vehicle. During the proffer, CD advised he was bringing the methamphetamine to Bangor, Maine to an individual identified as Daviston Jackson. Prior to travelling to Maine, Jackson provided CD with his location via cell phone indicating where he was supposed to travel to in Maine. A search of CD's cellular telephone seized at the time of his arrest revealed the message containing the location. An open source search of the GPS coordinates revealed the location was in the vicinity of 67 First Street in Bangor, Maine.

11.     On February 12, 2020, I participated in an interview with Bangor resident Carol Gordon. From reviewing records maintained by the Bangor Police Department (BPD) and

---

[1] CD is referred to in the masculine, regardless of actual gender. CD provided the information pursuant to a standard proffer agreement utilized by the U.S. Attorney's Office for the District of Maine. The agreement confers direct use immunity on all statements made by the proffering individual. CD was providing the proffer in hopes of consideration at the time of sentencing. No promises were made in this regard.

3

speaking with officers with knowledge, I learned that BPD officers had responded to Gordon's apartment located at 67 First Street, Apartment 1, Bangor, Maine on November 18, 2019, for a 911 hang up. Upon making contact with Gordon, officers also encountered Daviston Jackson in Gordon's apartment. During my interview with Gordon, I asked her about the incident and she told me that she knew the person in her apartment during that incident as "Matti." Gordon told me that "Matti" sold drugs, specifically, crack cocaine, heroin and methamphetamine. Gordon admitted she was a user of crack cocaine and further admitted "Matti" was selling narcotics from her apartment. Gordon stated she was supplied with crack cocaine for allowing people to sell narcotics from her residence. Gordon was shown a Massachusetts driver's license photo of Jackson from 2014. Gordon indicated she believed the person in the photograph was "Matti" but was unsure because "Matti" now had long dreadlocks. Gordon also indicated "Matti" was a worker for an individual going by the moniker "Chinx" and the group also had an association with Ronald Spencer's apartment located at 66 Sanford Street, Apartment 2 in Bangor, Maine. Gordon provided telephone number (207) 631-3939 (Target Telephone) as a number used by "Chinx's" workers and she provided a second number for "Chinx" himself.

### Arrest of Daniel McBreairty on February 27, 2020 and Search Warrant of her Cellular Telephone bearing number (207) 478-4610

12.     I have learned from reviewing incident reports and speaking with involved officers, that on February 27, 2020, Danielle McBreairty was arrested by members of the Maine Drug Enforcement Agency (MDEA) in Topsham, Maine after a controlled purchase of methamphetamine. A state search warrant was later obtained for a locked bag in the car which was found to contain approximately four (4) pounds of methamphetamine and one (1) pound of an unknown powder. McBreairty identified a white iPhone in the vehicle as hers at the time of

4

her arrest. Members of the MDEA later applied for and received a state search warrant for the phone identified by McBreairty. Pursuant to the search warrant, the iPhone was forensically examined and a copy of its contents downloaded.

13. In March 2020, I was provided a copy of the forensic download of McBreairty's cellular telephone bearing telephone number (207) 478-4610. Upon reviewing information seized from the phone, I observed text message communication between McBreairty's telephone and Target Telephone on February 22, 2020. McBreairty labeled Target Telephone as "The Brothers" in her phone. At the beginning of the text conversation, the user of Target Telephone identified himself as "Matty." Your affiant believes this is the same moniker that was provided by Gordon even though at the time agents believed Gordon was saying "Matti." As stated in paragraph 11, Gordon provided (207) 631-3939 (Target Telephone) as the number used by "Chinx's workers."

14. In reviewing the text messages contained on the forensic download of McBreairty's telephone, I found a particular text exchange that occurred between approximately 1:12 a.m. (UTC -5) and 5:40 a.m. (UTC -5) on February 22, 2020. In this regard, the McBreairty telephone texted the Target Telephone, "Hey got stacks for ya. You guys should come here n grab it. I'm so exhausted." Target Telephone later texted back to McBreairty, "Okay we'll come did you want the other 70 or wait??" McBreairty texted, "Need the other 70 for sure" and Target Telephone texted back, "Alright we'll head out in about 15." The rest of the conversation consisted of McBreairty giving directions to her residence in Glenburn, Maine telling Target Telephone she would unlock (the door) and gave directions to her room in the residence. Based on my training and experience, when McBreairty tells Target Telephone she has "stacks," I believe she is referring to $1,000.00 "stacks" of U.S. Currency. When the person using the

Target Telephone asked McBreairty if she wanted the other "70", I believe this is a reference to 70 grams of narcotics, specifically methamphetamine. I know that people involved in narcotics trafficking will provide additional narcotics to customers upon receiving payment for narcotics that are provided without payment or "fronted." When payment occurs, an additional amount of narcotics are given, which I believe is illustrated above.

15. Your affiant is familiar with McBreairty from other ongoing federal and state investigations involving the distribution of methamphetamine in and around the greater Bangor area and New Hampshire. In this regard, I was present during a consent search of McBreairty's apartment in the Bangor area on January 6, 2020, when methamphetamine was found at that location, together with other evidence indicating she was involved in large scale methamphetamine trafficking. In addition, when I reviewed the text messages from McBreairty's telephone, I observed several text messages between her telephone and the telephone number that Carol Gordon provided for "Chinx" that, based on my training and experience, I recognized as being related to narcotics trafficking. Therefore, I have reason to believe the organization being run by "Chinx" is supplying McBreairty with methamphetamine.

16. On April 7, 2020, I observed McBreairty leaving 66 Sanford Street, Bangor, Maine. The aforementioned address, specifically Apartment #2, was identified as being associated with the "Chinx" organization during my interview with Carol Gordon. See Paragraph 11, supra. I have conducted surveillance of this location and observed vehicles parked outside the Sanford Street residence believed to have been rented by members of the "Chinx" organization, including a vehicle rented by Daviston Jackson.

### Telephone Analysis of Target Telephone Reveals Evidence of Texting as a Primary Way of Communication and Continued Contact with Danielle McBreairty.

17. During the course of the investigation, DEA has obtained call detail records of Target Telephone from the telephone's activation on or about January 9, 2020, through April 27, 2020. During this time frame, call detail records indicated Target Telephone had 2,349 incoming/outgoing calls and 3,429 incoming/outgoing text messages. Over half of the communication over the Target Telephone is conducted via text messaging.

18. After the arrest of McBreairty and her posting bail in February 2020, agents identified two new telephone numbers being utilized by McBreairty as (207) 659-8842 and (207) 478-2250. The telephone numbers were obtained through recorded jail calls at the Aroostook County Jail and Penobscot County Jail. Telephone number (207) 659-8842 was also provided by McBreairty to individuals involved in this investigation over her Facebook account which was the subject of a State of Maine search warrant after her arrest on February 27, 2020. My review of call detail records for Target Telephone reveal records of text messages being exchanged between McBreairty's (207) 659-8842 telephone and Target Telephone 245 times between March 5, 2020, and April 11, 2020. My further review of call detail records reveals that McBreairty's second telephone, (207) 478-2250, exchanged text messages with Target Telephone 26 times between March 4, 2020, and April 21, 2020. Although McBreairty obtained new telephone numbers, call detail records show Target Telephone continues to text with McBreairty. Based on previous captured text communications between Target Telephone and another phone used by McBreairty, I believe Target Telephone continues to use text messaging as a way to discuss narcotic-related transactions with McBreairty and others.

19. On May 6, 2020, the U.S. Attorney's Office sent a preservation letter to Verizon Wireless requesting that all text message content for the Target Telephone be preserved. Based

7

on my training and experience, I know that Verizon Wireless typically retains text message content on its servers for approximately 6 to 10 days.

## FURTHER BACKGROUND AND TRAINING AND EXPERIENCE OF AFFIANT

20. Based on my training and experience, and conversations with other law enforcement agents who have conducted controlled substance distribution investigations, I know the following:

- A. Distributors of controlled substances often communicate with their co-conspirators using cellular phones and often use multiple cellular telephones to compartmentalize their operations or to avoid detection by law enforcement;

- B. Distributors of controlled substances frequently use these cellular telephones to not only engage in voice communications, but also to send text messages, emails, and digital photographs to their co-conspirators in furtherance of their criminal activity, including both drug trafficking and the laundering of drug proceeds.

- C. The high volume of text messages over the Target Telephone, when viewed in conjunction with the other evidence summarized above, is consistent with the use of the Target Telephone to send and receive drug related text messages.

21. In my training and experience, I have learned that Verizon Wireless is a company that provides cellular telephone access to the general public, and that stored electronic communications, including retrieved and unretrieved voicemail, text, and multimedia messages for Verizon Wireless subscribers may be located on the computers of Verizon Wireless. Further, I am aware that computers located at Verizon Wireless contain information and other stored electronic communications belonging to unrelated third parties.

8

22. Wireless phone providers often provide their subscribers with voicemail services. In general, a provider will store voicemail messages on behalf of a particular subscriber until the subscriber deletes the voicemail. If the subscriber does not delete the message, the message may remain in the system of Verizon Wireless for weeks or months.

23. Among the services commonly offered by wireless phone providers is the capacity to send short text or multimedia messages (photos, audio, or video) from one subscriber's phone or wireless device to another phone or wireless device via one or more wireless providers. This service is often referred to as "Short Message Service" ("SMS") or "Multimedia Messaging Service" ("MMS"), and is often referred to generically as "text messaging" or "wireless messaging."

24. Wireless phone providers typically retain certain transactional information about the use of each telephone, voicemail, and text-messaging account on their systems. This information can include log files and messaging logs showing all activity on the account, such as local and long distance telephone connection records, records of session times and durations, lists of all incoming and outgoing telephone numbers or e-mail addresses associated with particular telephone calls, voicemail messages, and text or multimedia messages. Providers may also have information about the dates, times, and methods of connecting associated with every communication in which a particular cellular device was involved.

25. Many wireless providers retain information about the location in which a particular communication was transmitted or received. This information can include data about which "cell towers" (i.e., antenna towers covering specific geographic areas) received a radio signal from the cellular device and thereby transmitted or received the communication in question.

9

26. Wireless providers may also retain text messaging logs that include specific information about text and multimedia messages sent or received from the account, such as the dates and times of the messages. A provider may also retain information about which cellular handset or device was associated with the account when the messages were sent or received. The provider could have this information because each cellular device has one or more unique identifiers embedded inside it. Depending upon the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Station Equipment Identity ("IMEI"). When a cellular device connects to a cellular antenna or tower, it reveals its embedded unique identifiers to the cellular antenna or tower in order to obtain service, and the cellular antenna or tower records those identifiers as a matter of course.

27. Wireless providers also maintain business records and subscriber information for particular accounts. This information could include the subscribers' full names and addresses, the address to which any equipment was shipped, the date on which the account was opened, the length of service, the types of service utilized, the ESN or other unique identifiers for the cellular device associated with the account, the subscribers' Social Security Numbers and dates of birth, all telephone numbers and other identifiers associated with the account, and a description of the services available to the account subscribers. In addition, wireless providers typically generate and retain billing records for each account, which may show all billable calls (including outgoing digits dialed). The providers may also have payment information for the account, including the

10

dates and times of payments and the means and source of payment (including any credit card or bank account number).

28. In some cases, wireless subscribers may communicate directly with a wireless provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Wireless providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

## METHODS TO BE USED TO EXECUTE SEARCH

29. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Verizon Wireless to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

30. In this case, because Verizon Wireless personnel will be assisting in the execution of the search warrant and the search will be no more intrusive at night than during the day, I request that the Court find that there is good cause to execute the warrant during either daytime or nighttime. See Fed. R. Crim. P. 41(e)(2)(a)(ii).

## CONCLUSION

31. Based on my training and experience, and the facts as set forth in this affidavit, there is probable cause to believe that on the computer systems in the control of Verizon Wireless there exists evidence of a crime, specifically, violations of Title 21, United States Code, Sections 841(a)(1), 843, 846 and 856, by Daviston Jackson, FNU LNU, a/k/a "Chinx or Chinks," Danielle McBreairty and others. Accordingly, a search warrant is requested.

Bryan Klutzaritz
Special Agent
United States Drug Enforcement Administration

Sworn to telephonically and signed electronically in accordance with the requirements of Rule 4.1 of the Federal Rules of Criminal Procedure

Date: May 14, 2020

City and state: Bangor, Maine

Judge's signature

John C Nivison U.S. Magistrate Judge
Printed name and title